UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:19-CR-20351-CMA

UNITED STATES OF AMERICA

vs.

LUIS ALBERTO CHACIN HADDAD,

    **Defendant.**
_____/

## FACTUAL PROFFER

The United States and LUIS ALBERTO CHACIN HADDAD ("Defendant") stipulate and agree that if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, which prove that Defendant is guilty of Count 1 of the Information, conspiracy to commit felony violations of the Foreign Corrupt Practices Act (Title 15, United States Code, Sections 78dd-2 and 78dd-3), in violation of Title 18, United States Code, Section 371:

    1.    Defendant is a citizen of Venezuela and resident of the United States. Defendant owns and manages businesses in Miami, Florida, including Search Trading, LLC ("Search Trading"), and Headline, LLC ("Headline"), both of which are registered under the laws of the State of Florida. Search Trading and Headline are "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1). Defendant is a "domestic concern" and an officer, employee, and agent of domestic concerns (Search Trading and Headline) as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1). Search Trading and Headline purchase goods from around

the world for export to Central and South America. Search Trading holds a bank account at Citibank and Headline holds a bank account at Bank of America.

2.   Jesus Ramon Veroes ("Veroes") is a Venezuelan citizen and operates various businesses in Venezuela and the United States. Veroes is a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1). Veroes's close relative is listed as the President of NV Oriental Trading Corporation ("NV Oriental Trading"), a company based in Doral, Florida, and incorporated under the laws of the State of Florida. NV Oriental Trading holds a bank account at Bank of America. NV Oriental Trading is a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3.   Foreign Official 1 was a high-level official in Venezuela's Ministry of Electrical Energy and at Venezuela's state-owned electric company, Corporación Eléctrica Nacional, S.A. ("Corpoelec"). Corpoelec is controlled by the Venezuelan government and performs a function that Venezuela treats as its own, and thus is an "instrumentality" of the government of Venezuela as that term is defined in the FCPA. Corpoelec held a bank account at Citibank. Foreign Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

4.   Foreign Official 2 was a high-level official in procurement at Corpoelec and worked under Foreign Official 1. Foreign Official 2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

5.   Confidential Witness 1 ("CW-1") is a dual citizen of Venezuela and the United States. CW-1 is a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6. Co-Conspirator 1 is a dual citizen of Venezuela and the United States, is President of a Florida corporation based in Port St. Lucie, Florida, and previously worked as director of a Venezuelan electric company that later merged with two other electric companies to form Corpoelec. Co-Conspirator 1 is a "domestic concern" and an officer, employee and agent of a domestic concern as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(a) and 78dd-2(h)(1).

7. Beginning in approximately 2010, Defendant and CW-1 engaged in various business ventures, and for a period of time, the two occupied office suites next to each other in a building in Doral, Florida. Toward the end of 2015, Defendant and CW-1 approached Co-Conspirator 1 about assisting them in obtaining business with Corpoelec. During a trip to Venezuela, Defendant, CW-1, and Co-Conspirator 1 met the Corpoelec employee in charge of a major projects department, who introduced them to Foreign Official 2, a person Co-Conspirator 1 already knew.

8. Defendant and Co-Conspirator 1 submitted competitive bids on multiple contracts to provide equipment to Corpoelec. The bids were often at below-market prices to increase their chances of winning the contract. Defendant and Co-Conspirator 1 were not successful in obtaining contracts from Corpoelec based on those bids.

9. In or about early 2016, while in Venezuela, Defendant informed Veroes about his failed attempts to win Corpoelec contracts. Veroes told Defendant that he (Veroes) had a longstanding personal relationship with Foreign Official 1. Defendant gave Veroes a proposal to supply Corpoelec with transformers, generators, and forklifts, which Veroes agreed to raise with Foreign Official 1.

10. Veroes subsequently met with Foreign Official 1 in Foreign Official 1's office in Venezuela and discussed the contract proposal with him. Foreign Official 1 liked the presentation, called Foreign Official 2 into his office while Veroes was present, and directed Veroes to work with Foreign Official 2 to finalize the contracts for transformers, generators, and forklifts.

11. Veroes informed Defendant of his meeting with Foreign Official 1 and told Defendant that they would need to give some profits from the contracts to Foreign Official 2 in order to get the contracts granted. Defendant understood that the purpose of the payments to Foreign Official 2 was to obtain business and secure an improper advantage with Corpoelec. Defendant also believed that a portion of the payments to Foreign Official 2 would go to Foreign Official 1.

12. Defendant and Co-Conspirator 1 traveled from the United States to Venezuela to finalize the following contracts with Corpoelec: (a) contract dated July 11, 2016, for Search Trading to provide forklifts to Corpoelec for $6,429,000; (b) contract dated August 1, 2016, for Search Trading to provide transformers to Corpoelec for $9,798,250; and (c) contract dated July 21, 2016, for Search Trading to provide generators to Corpoelec for $893,713.89. Foreign Official 1 and Foreign Official 2 approved the contracts before they were signed on behalf of Corpoelec.

13. In or about the summer of 2016, Defendant and Veroes met in Miami, Florida, and discussed the sharing of profits from Corpoelec contracts they were awarded. Defendant and Veroes later agreed that they would each keep approximately $5.5 million in profits from the contracts and they also agreed on the share of profits that Foreign Official 2, CW-1, and Co-Conspirator 1 would each receive.

14. On or about June 15, 2016, during a meeting in Doral, Florida, Defendant discussed the division of profits from Corpoelec contracts with CW-1. Defendant informed CW-1 of a fourth Corpoelec contract for Co-Conspirator 1's company to provide miscellaneous parts to Corpoelec.

15. Defendant and Veroes were awarded additional contracts with Venezuela state-owned entities, including a contract dated on or about December 6, 2016, between Headline and Corpoelec for Headline to supply Corpoelec lightbulbs for approximately $5,799,999, and a contract dated on or about January 13, 2017, between Headline and the Corporación Venezolana de Comercio Exterior ("Corpovex") for Headline to supply Corpoelec 169,000 street lightbulbs for approximately $35,740,500.

16. Search Trading and Headline received payments on Corpoelec contracts by wire transfers to their Citibank and Bank of America accounts, respectively, in Miami, Florida. Defendant caused Search Trading and Headline to transfer money from these accounts to, or for the benefit of, Veroes, including transfers to NV Oriental Trading of approximately $1,283,492.87 on or about March 31, 2017, and approximately $1,283,492.00 on or about May 11, 2017.

17. Defendant and Veroes paid kickbacks to, or for the benefit of, Foreign Official 2 from the profits on Corpoelec and Corpovex contracts and did so in accordance with Foreign Official 2's instructions. Those payments include, but are not limited to, a wire transfer of approximately $71,250 from Search Trading's Citibank account in Miami, Florida, to an overseas entity on or about August 24, 2016; a wire transfer of approximately $401,300 from the account of a Dubai entity to an overseas entity, on or about September 13, 2018; and multiple deliveries of cash in the fourth quarter of 2018.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 6/24/19          By: _____
                            MICHAEL B. NADLER
                            ASSISTANT UNITED STATES ATTORNEY

ROBERT ZINK
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION

Date: 6/24/19          By: _____
                            JOHN-ALEX ROMANO
                            TRIAL ATTORNEY

DEBORAH L. CONNOR
CHIEF, MONEY LAUNDERING &
ASSET RECOVERY SECTION
Department of Justice, Criminal Division

Date: 6/24/19          By: _____
                            JOSEPH PALAZZO
                            TRIAL ATTORNEY

Date: 6/24/19          By: _____
                            THERESA VAN VLIET
                            ATTORNEY FOR DEFENDANT

Date: 06/24/19         By: _____
                            LUIS ALBERTO CHACIN HADDAD
                            DEFENDANT